IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | I N D I C T M E N T |
| | ) | |
| Plaintiff, | ) | CASE NO.: **1 : 15 C R 365** |
| | ) | |
| v. | ) | JUDGE **JUDGE BOYKO** |
| | ) | |
| PAUL RODAK, | ) | Title 15, United States Code, Sections |
| LOCHLAINN O'HAIMHIRGIN, | ) | 78j(b) and 78ff, Title 17, Code of Federal |
| | ) | Regulations, Section 240.10b-5, Title 18, |
| Defendants, | ) | United States Code, Sections 1014, 1341, |
| | ) | 1343, 1344, 1349, and 2 |

The Grand Jury charges:

I.      GENERAL ALLEGATIONS

A.      Defendants and Entities

At all times material to this Indictment, except where otherwise noted:

1.      Defendant PAUL RODAK (hereinafter, "RODAK") was a resident of Kirtland,

Ohio.  RODAK served as a registered financial advisor from in or around 1996 to in or around

May 2009.

2.      Defendant LOCHLAINN O'HAIMHIRGIN (hereinafter, "O'HAIMHIRGIN")

was a resident of Highland Heights, Ohio.  O'HAIMHIRGIN served as a registered financial

advisor from in or around 1998 to in or around May 2009.

3.     Legend Financial Group Ltd. (hereinafter, "LFG") was an Ohio corporation with its principal place of business at 2778 S.O.M. Center Rd., Suite 200, Willoughby Hills, Ohio, which then moved to 387 Golfview Lane, Highland Heights, Ohio, in or around January 2007. LFG was formed in 2000, and was in the business of financial advising, retirement planning, and insurance sales.  LFG was owned and operated by RODAK and O'HAIMHIRGIN.

4.     Legend Development Group LLC (hereinafter, "LDG") was an Ohio corporation with its principal place of business at 387 Golfview Lane, Highland Heights, Ohio.  LDG was formed in or around 2005 for the purpose of constructing and operating the building located at 387 Golf View Lane, Highland Heights, Ohio (hereinafter, the "Legend Office Building").  LDG was owned and operated by RODAK, O'HAIMHIRGIN, and MM.

5.     Associated Securities Corp. (hereinafter, "ASC") was formed in 1982 in the state of California.  The principal address was One Beacon Street, 22nd Floor, Boston, Massachusetts. ASC was formed for the purpose of serving as a brokerage firm and an investment adviser firm. ACS ceased doing business on or about November 10, 2010.

6.     Cambridge Investments Research, Inc. (hereinafter, "Cambridge") was an Iowa corporation with its principal place of business at 1776 Pleasant Plain Road, Fairfield, Iowa. Cambridge was an independent broker dealer in the business of offering non-proprietary products, such as mutual funds or life insurance.

7.     Lipotech, LLC (hereinafter, "Lipotech") was an Ohio corporation with its principal place of business at 30195 Chagrin Blvd., Suite 210, Pepper Pile, Ohio.  Lipotech was formed in or around 2000, and was in the business of scientific research and development. Lipotech was owned and operated by BM, JB, DB, and JM.  Lipotech was dissolved on or about January 20, 2012.

8.      Lipotech Technology Holdings, LLC (hereinafter, "LTH") was an Ohio limited liability corporation with its principal place of business at 30195 Chagrin Blvd, Ste. 210, Cleveland, Ohio.  LTH was formed in or around 2009 for the purpose of developing technology, including participating as a member of CCO Technology, Ltd., discussed herein.  LTH was owned and operated by J&B 08 LLC, Lipotech, and Lipotech Partners LP.  LTH was dissolved on or about February 3, 2012.

9.      Lipotech Partners LP (hereinafter, "Lipotech Partners") was a Delaware limited partnership.  Lipotech Partners was formed on or about July 13, 1990, and had developed and owned technology that was the subject of a technology transfer agreement with CCO Technology, Ltd.  BM was a general partner for Lipotech Partners.

10.     Ross Partners, LLC (hereinafter, "Ross Partners") was an Ohio limited liability corporation with its principal place of business at 387 Golf View Lane, Highland Heights, Ohio.  Ross Partners was formed in or around May 2007.  The members of Ross Partners were RODAK, O'HAIMHIRGIN, SL, and SP.

11.     Ross Science, LLC (hereinafter, "Ross Science") was an Ohio limited liability corporation with its principal place of business at 387 Golfview Lane, Highland Heights, Ohio.  Ross Science was formed in or around October 2007, and was in the purported business of financing, acquiring, owning, managing, holding, and disposing a membership interest in CCO Technology, Ltd.  The original principals of Ross Science were RODAK, O'HAIMHIRGIN, SL, and SP.

12.     CCO Technology, Ltd (hereinafter, "CCO") was an Ohio limited liability corporation with its principal place of business at 387 Golfview Lane, Highland Heights, Ohio.  CCO was formed in or around 2007, and was a holding company with the anticipated ownership

3

of certain patents, patent applications, and technology related to lipids. CCO's anticipated use of these patents and technology was to research, develop, manufacture, distribute, and sell products. It was anticipated that Lipotech would own 25% of CCO and Ross Science would own the remaining 75%. CCO was dissolved on or about January 25, 2010.

13.     Tersus Pharmaceuticals (hereinafter, "Tersus I") was a Nevada limited liability corporation with its principal place of business at 387 Golfview Lane, Highland Heights, Ohio. Tersus I was formed in or around March 2010. The original principals of Tersus were RODAK, O'HAIMHIRGIN, SL, SP, and the Ross Science investors as of on or about April 30, 2010. On or about March 28, 2011, Tersus I entered into a merger agreement with Tersus Pharmaceuticals, LLC, (hereinafter, "Tersus II," and together with Tersus I, hereinafter "Tersus"), a Delaware limited liability corporation.

14.     Cynergies Solutions Group (hereinafter, "Cynergies") was a trade name registered to Cynergies Consulting, Inc., in the state of Ohio on or about August 1, 2003. The principal place of business was located in Highland Heights, Ohio. Cynergies was formed by DH and EC. and was in the business of providing information technology staffing services.

15.     Parkview Federal Savings Bank (hereinafter, "Parkview"), now known as First National Bank, was located at 30000 Aurora Road, Solon OH. Parkview was a local community bank providing financial services, including bank accounts and lending programs, for individuals and businesses.

16.     Parkview was a financial institution, as defined in Title 18, United States Code, Section 20, the deposits of which were insured by the Federal Deposit Insurance Corporation.

## II.     FACTUAL ALLEGATIONS

A.     <u>RODAK and O'HAIMHIRGIN's Professional Licenses</u>

17.     RODAK and O'HAIMHIRGIN were financial advisors who owned and operated LFG. LFG was formed in or around 2000, and was in the business of providing financial advice, retirement planning, and insurance sales. From in or around 2000, through in or around April 2009, RODAK and O'HAIMHIRGIN were registered with a variety of broker dealers, including ASC and Cambridge.

18.     RODAK held two licenses that were administered by the Financial Industry Regulatory Authority (hereinafter, "FINRA"), the Series 6 and the Series 26. On or about June 27, 1996, RODAK passed his Series 6, an examination designed to assess an individual's knowledge, skill, and abilities to function as an Investment Company and Variable Contracts Products Representative. On or about December 7, 1998, RODAK passed his Series 26, an examination designed to assess an individual's knowledge, skill, and abilities to function as a principal, including personnel management activities, supervision of associated persons and sales practices, and overseeing compliance of a broker dealer and its offices. RODAK was also licensed with the state of Ohio to sell various types of insurance from in or around 1996 until on or about April 28, 2010, when his license was revoked.

19.     O'HAIMHIRGIN held one license that was administered by FINRA. In or around July 1998, O'HAIMHIRGIN passed his Series 6. O'HAIMHIRGIN was also licensed with the state of Ohio to sell various types of insurance from 1998 to in or around August 31, 2012, when his license was cancelled.

B.    The Legend Office Building

20.    In or around 2005, RODAK and O'HAIMHIRGIN formed LDG to construct and operate an approximately 40,000 square foot office building in Highland Heights, *i.e.*, the Legend Office Building, which would serve as the new office space for LFG. The constructed building was expected to be worth approximately $4 million. It was anticipated that approximately $3.2 million would be funded by bank financing and approximately $800,000 would be provided by RODAK and O'HAIMHIRGIN. MM's contribution was "sweat equity" for the construction of the Legend Office Building.

21.    RODAK and O'HAIMHIRGIN applied for financing through Parkview. The first loan was approved in or around 2005 for approximately $3.2 million.

22.    RODAK and O'HAIMHIRGIN were unable to personally contribute $800,000 as originally contemplated. RODAK and O'HAIMHIRGIN, therefore, applied for a second loan from Parkview. In or around 2007, Parkview approved a second loan for up to $800,000. Only $600,000 of the second loan, however, was disbursed.

23.    As part of the loan process for each loan, Parkview required LDG, RODAK, and O'HAIMHIRGIN to provide financial information, including financial statements (both for the business and personally) and proof of income, which included copies of Legend Office Building tenant leases.

C.    The Cynergies Lease Agreement

24.    Cynergies, led by President DH and Vice President EC, was searching to lease new space for its headquarters. In or around 2006, Cynergies and LDG, through RODAK and O'HAIMHIRGIN, began negotiating a lease for Cynergies to occupy space in the Legend Office Building.

6

25.    In or around December 2006, during the negotiations, RODAK and

O'HAIMHIRGIN proposed that DH and EC sponsor the 2007 Legend Financial Group Classic, a

golf tournament on the Nationwide Tour.  DH and EC agreed with RODAK and

O'HAIMHIRGIN to contribute approximately $100,000 to sponsor the 2007 golf tournament.  In

exchange, RODAK and O'HAIMHIRGIN agreed with DH and EC that they would treat the

$100,000 sponsorship as "prepaid rent," deducted from the monthly lease amount on a prorata

basis over the duration of the lease.  As part of this agreement, RODAK and O'HAIMHIRGIN

agreed with DH and EC that Cynergies could also treat as "pre-paid rent" the $50,000 it

previously paid to sponsor the 2006 golf tournament.

26.    On or about January 16, 2007, while the Legend Office Building was still under

construction, Cynergies executed a formal lease agreement with LDG.  The rental period began

on or about March 1, 2007, and ended in or around February 2012, with a monthly rental

payment of $10,851.

27.    When reviewing this lease agreement, DH noticed the monthly lease payment of

$10,851 did not reflect the deduction of the "prepaid rent" previously discussed with RODAK

and O'HAIMHIRGIN.  When DH and EC questioned RODAK, he indicated an addendum to the

lease would be executed, but that Parkview had requested a copy of the lease and that it was

urgent for RODAK and O'HAIMHIRGIN to present the lease agreement to Parkview.  DH

signed the first lease, anticipating the amended term lease in the near future.

28.    On or about January 26, 2007, RODAK and O'HAIMHIRGIN provided a

Cynergies lease addendum to DH and EC.  Contained within that new lease, initialed and signed

by both RODAK and O'HAIMHIRGIN, was mention of the prepayment of $150,000 and the

reduced monthly rent of approximately $8,351.00.  The addendum was signed by all parties.

29.     Parkview used an appraiser during the underwriting process for the second loan. On or about July 13, 2007, LFG sent and caused to be sent the Legend Office Building lease agreements to Parkview and the appraiser. RODAK and O'HAIMHIRGIN did not provide the addendum to the Cynergies lease agreement to Parkview. The appraiser's valuation of the Legend Office Building was based on Cynergies monthly rent of approximately $10,851, not the lesser amount of $8,351.

E.     RODAK and O'HAIMHIRGIN Commit To Fund C:16 Oil Compound Technology

30.     Beginning in the 1980s and through the 1990s, researchers JB, DB, and JM worked on a theory that a certain oil compound known as C:16 could reverse the build-up of plaque within the arteries. In or around 1993, the researchers obtained a patent related to this technology. In or around 1997, businessman BM joined the group, and together they formed Lipotech. BM provided approximately $2 million of funding to further develop the technology, which included testing of the oil at Case Western Reserve University and other activities through in or around 2007.

31.     In or around 2006, Lipotech gave a presentation on the oil to the Cleveland Clinic. MP was assigned by the Cleveland Clinic to work with Lipotech. In or around 2007, MP, in conjunction with Lipotech and Ross Science, discussed herein, established a clinical mouse study to be conducted by the Cleveland Clinic to test Lipotech's oil.

32.     In or around 2007, JB told his LFG financial advisor, SL, about the oil Lipotech was developing. SL shared her conversation with RODAK and O'HAIMHIRGIN, who were interested in Lipotech's oil.

33.     In or around 2007, for purposes of obtaining additional funding, BM and JB gave a presentation on Lipotech's oil to RODAK, O'HAIMHIRGIN, SL, and SP.

8

34. On or about September 13, 2007, Ross Partners, BM, JB, Lipotech Partners, and Lipotech executed a letter setting forth the terms and conditions governing the formation of CCO. According to the letter agreement, Ross Partners would pay the Cleveland Clinic to conduct a mouse test of the "Plaque Reduction Technology." Upon receipt of the test results, Ross Partners could decide, in its sole discretion, if it wanted to proceed with funding the technology and form CCO. Ross Partners' decision to exercise its right to proceed with the formation would result in Lipotech Partners transferring patents and technology to CCO and CCO issuing to Lipotech 25% equity in CCO. The letter agreement committed Ross Partners, including RODAK and O'HAIMHIRGIN, to offer CCO equity securities to investors for a total offering price of at least $10 million. The proceeds of the offering were to be used to reimburse BM and provide working capital for CCO's business.

35. On or about October 16, 2007, Ross Science registered with the Ohio Secretary of State. The four principals of Ross Science each provided approximately $6,000, which was used as the approximately $24,000 down payment for the Cleveland Clinic mouse trials with the remaining balance due at a later date.

F. RODAK and O'HAIMHIRGIN's Financial and Regulatory Difficulties

36. In addition to the two loans totaling nearly $4 million from Parkview, on or about September 15, 2006, RODAK and O'HAIMHIRGIN, acting through LFG, also applied for, and received, a loan in the approximate amount of $400,000 from ASC, their former broker dealer.

37. Beginning at least as early as in or around November 2006, LFG was receiving and providing answers to inquiries from NASD Chicago District Office regarding LFG's involvement in the stock to cash and emerging money programs. These investment transactions

were made by RODAK and O'HAIMHIRGIN, on behalf of their clients, and purportedly involved clients pledging stock to obtain loans.

38.     On or about June 4, 2007, ASC sent a notice of demand letter to RODAK and O'HAIMHIRGIN, stating that "with both of your registrations being terminated from [ASC] . . . the entire unpaid principal balance and any accrued interest on the loan between [ASC's finanicial company] and [LFG] has now become automatically due and payable [on or before July 5, 2007]. As of today, the outstanding amount is $372,583.11."

39.     On or about June 8, 2007, RODAK and O'HAIMHIRGIN, signing on behalf of LFG, executed a note payable wherein they borrowed $400,000 from TG at an interest rate of 2% per month.

40.     Soon thereafter, on or about June 15, 2007, RODAK testified before the Ohio Department of Commerce, Division of Securities, regarding an emerging money program with which he was involved.

41.     On or about September 12, 2008, Parkview mailed a letter to LDG, stating that "[a]s a valued customer of Park View Federal, we are concerned that your account is past due and that, despite our several attempts to contact you by phone, we have failed to reach you. We are here to help. If you would simply call us, we would be more than happy to work with you."

G.     RODAK and O'HAIMHIRGIN Begin Soliciting Investors

42.     At or around the same time as the Parkview past due notice, in or around September 2008, RODAK and O'HAIMHIRGIN began presenting the Lipotech C:16 oil technology to potential investors and soliciting investments. As discussed below, RODAK and O'HAIMHIRGIN misrepresented how the investment monies would be spent, the possible returns on investments, and the timing of the returns.

43.     When RODAK and O'HAIMHIRGIN successfully induced investors to invest in the technology, they were required under the CCO letter agreement to provide investors with equity securities in CCO. Instead, RODAK and O'HAIMHIRGIN sold to investors their personal membership interests in Ross Science. RODAK and O'HAIMHIRGIN personally received the proceeds of these membership interest transactions. CCO received only a fractional amount of capital from these sales.

44.     In addition to paying their personal expenses with investor monies, on several occasions discussed herein, RODAK and O'HAIMHIRGIN used investor money to make payments on LDG's loans from Parkview. For instance, on or about September 19, 2008, RODAK and O'HAIMHIRGIN used investor money to make a payment in the amount of approximately $24,250 on the Parkview loan.

45.     On or about October 13, 2008, MP provided favorable initial findings from the mouse study to Ross Science and Lipotech.

46.     On or about November 7, 2008, RODAK, on behalf of Ross Science, notified Lipotech, in writing, of its intention to proceed with forming CCO.

47.     From on or about November 7, 2008, to on or about April 23, 2009, Lipotech and Ross Science negotiated the terms of the CCO Operating Agreement and the attached exhibits, including a Technology Transfer Addendum (hereinafter, the "TTA"). Per the CCO Operating Agreement, Lipotech provided all of the patents and technology to CCO contingent upon Ross Science securing $6 million, reduced from $10 million, in funding by on or about January 23, 2010 (hereinafter, the "Funding Deadline"). If Ross Science failed to raise $6 million by the Funding Deadline, the TTA would terminate and all of the technology (including the patents)

would return to Lipotech. CCO would cease to exist and, pursuant to a non-compete clause, Ross Science could not pursue the technology.

**H.**   RODAK and O'HAIMHIRGIN's Additional Financial and Regulatory Pressures

48.   On or about December 17, 2008, FINRA mailed letters to RODAK and O'HAIMHIRGIN, requesting documents related to the stock to cash deals that they had brokered for investors.

49.   In or around January 2009, FINRA notified Cambridge—RODAK and O'HAIMHIRGIN's then broker dealer—of a complaint regarding stock to cash transactions that had been brokered by RODAK and O'HAIMHIRGIN.

50.   During the course of the FINRA investigation, in or around May 2009, RODAK and O'HAIMHIRGIN voluntarily resigned from Cambridge. As a result of no longer being registered with any broker, RODAK and O'HAIMHIRGIN could no longer permissibly generate income through the buying and selling of registered securities on behalf of clients. RODAK and O'HAIMHIRGIN remain unregistered.

**I.**   Ross Science Private Placement Memorandum

51.   At least as early as in or around May 2009, Ross Science began drafting versions of the Ross Science Private Placement Memorandum (the "PPM"). The PPM provided prospective investors with details about the Ross Science opportunity and investment in CCO. On or about June 22, 2009, a final version was completed. By this date, however, many investors had already invested in Ross Science, including DS, LKH, HG, KL, TB, RB, JC, FC, TG, and AM. According to the PPM, existing members, including RODAK and O'HAIMHIRGIN, owned 98% of Ross Science. The remaining 2% would be available to investors under the terms of the PPM. Ross Science was to sell and issue units of membership

interests in, and contribute proceeds raised from the issuance to, CCO. Proceeds from the PPM were to be held in escrow. The PPM confirmed that January 23, 2010, was the date by which Ross Science was required to contribute $6,000,000 to CCO. A failure to provide the funds would terminate the TTA, require the return of investor funds, and prohibit Ross Science from pursuing the technology.

52. Beginning with the mice study in 2008, Ross Science made some efforts to pursue the technology. Ross Science hired JB as a consultant. JB assisted in presenting the science behind the technology to over sixty potential investors to help secure funding. A human study was initiated in or around July of 2009 in California, and various companies were contacted to assist in developing the C:16 oil.

53. On or about August 27, 2009, RODAK, O'HAIMHIRGIN, SL, and SP all signed an agreement that referenced the $6 million funding requirement and documented the potential loss of the technology if that funding was not acquired. The four agreed to each sell one-fourth of their equity to provide the funding, stating in the agreement, in part, that "[t]he members agree that it is extremely important for Ross to succeed in meeting that deadline."

54. Even after the PPM was completed and the August 27, 2009 letter agreement was signed, however, RODAK and O'HAIMHIRGIN continued to solicit prospective investors, to induce them to invest through material misrepresentations and concealments, and to sell their personal shares in Ross Science to enrich themselves. RODAK and O'HAIMHIRGIN used only fractional amounts of the investments to capitalize CCO.

55. In or around November and December 2009, RODAK began negotiations with Lipotech to extend the Funding Deadline by six months. An amendment to the operating agreement extending the Funding Deadline was drafted, but was neither finalized nor signed.

56.     RODAK and O'HAIMHIRGIN failed to meet the $6 million funding requirement, and the Funding Deadline passed. On or about January 25, 2010, BM sent a letter to Ross Science and CCO, terminating the relationship. BM requested a return of all technology, per the agreement, including all work-product created during the joint venture.

57.     On or about January 28, 2010, CCO was dissolved.

J.      Investment Solicitations

58.     Beginning in or around September 2008 and through October 2010 (over nine months past the January 2010 Funding Deadline), RODAK and O'HAIMHIRGIN solicited approximately eighteen individuals to invest an approximate combined amount of $4 million. These solicitations resulted in RODAK and O'HAIMHIRGIN selling their own personal Ross Science membership interests and receiving commissions for brokering the sale of other members' personal membership interests to other investors.

59.     Many of the investors were RODAK and O'HAIMHIRGIN's former LFG clients. Solicitation meetings involved presentations by RODAK, O'HAIMHIRGIN, JB, and MP, and were held at LFG's offices.

60.     During the presentations, JB and MP presented on the science and the technology for approximately thirty minutes. After their presentation, JB and MP exited the meeting, and RODAK, O'HAIMHIRGIN, and others at their direction, pitched the investment to the potential investors.

61.     In at least as early as in or around September 2009, RODAK and O'HAIMHIRGIN provided a presentation to potential investors that contained a slide outlining a 6 – 12 month return on investment ranging from 12.5% to 14,900.00% returns.

62.     RODAK and O'HAIMHIRGIN's presentation to potential investors stated that "Ross Science, LLC will make 3.0% available for new investment," implying that company shares, and not personal shares, would be sold to the investors.

63.     RODAK and O'HAIMHIRGIN's presentation to potential investors also stated that the purpose of the investment was for "Legal, Marketing, Medical Testing & Technology Acquisition Costs necessary to Maximize Shareholder Value."

64.     RODAK and O'HAIMHIRGIN also told potential investors that their investments were to be used to further the technology, including research and development, public relations, marketing, testing, patent expenses, manufacturing expenses, underwriting expenses, product development, and general operating expenses to bring the oil to market.

65.     Of the $4 million in investor funds, only approximately $200,000 was deposited into the Ross Science bank account and used to further the business and the technology.

66.     RODAK and O'HAIMHIRGIN used the Ross/CCO opportunity presented to investors to enrich themselves. Rather than "Ross Science, LLC [making] 3.0% available for new investment," RODAK and O'HAIMHIRGIN instead sold their personal shares to investors for their own personal benefit. These proceeds did not go towards the $6 million funding requirement.

67.     During the investment pitches, RODAK and O'HAIMHIRGIN did not disclose to many of the investors the existence or true status of the Funding Deadline. Once the Funding Deadline had passed and access to the technology was denied, RODAK and O'HAIMHIRGIN continued to solicit investments in a joint venture that no longer existed. For the few investors that were aware of the Funding Deadline, RODAK and O'HAIMHIRGIN misrepresented the

progress amount of investments and misled investors into believing that the Funding Deadline would be met and extended.

68.     RODAK and O'HAIMHIRGIN personally received approximately $1.8 million from investors which was used to enrich themselves and pay personal expenses, including loan payments to Parkview. RODAK also received $100,000 as compensation for his brokering of the sale of other members' personal Ross Science interests.

69.     Some of the representations and transactions that were part of the solicitations to investors included, but were not limited to, the following:

i.     Investors TB and RB:

70.     Investors TB and RB had known O'HAIMHIRGIN since in or around 2003. In or around the winter of 2008, O'HAIMHIRGIN presented Investor TB with an opportunity to get an oil technology to market. In or around February 2009, Investors TB and RB attended a presentation where some of the findings of the oil technology were discussed. The meeting included a few other investors, RODAK and O'HAIMHIRGIN, MP, JB, and two patent attorneys. JB described a type of oil that was being developed to reduce heart disease.

71.     O'HAIMHIRGIN represented to Investor TB that most of the research for the technology was complete. O'HAIMHIRGIN told Investor TB that the majority of investor money would be used for public relations and marketing. O'HAIMHIRGIN induced Investor TB and his wife, RB, to invest $100,000 into Ross Science. Soon after O'HAIMHIRGIN induced Investors TB and RB to invest, O'HAIMHIRGIN explained to them that they were investing in Ross Science, which was 75% owner of CCO, the company under which the technology was being developed. At no time did RODAK and O'HAIMHIRGIN make Investor

16

TB aware of the Funding Deadline. At no time did RODAK and O'HAIMHIRGHIN state that if they failed to meet the Funding Deadline, Ross Science would lose access to the technology.

72.     On or about January 7, 2010, in an e-mail to Investor TB, O'HAIMHIRGIN stated that he met with an individual who was coming on as a consultant for the oil, but there was no mention of the approaching January 23, 2010 Funding Deadline.

73.     On or about January 23, 2010, the Funding Deadline lapsed and RODAK and O'HAIMHIRGIN failed to meet the capital raise. At this time, all of the patents and technology reverted back to Lipotech and the relationship between Ross Science and Lipotech terminated.

74.     Around the time of the lapse in the Funding Deadline, RODAK drafted a letter on CCO letterhead to Intertek Agri Services, purporting to be the President of CCO and stating "[e]nclosed you will find a bottle of oil submitted by our company, CCO Technology Ltd. Please anaylize [sic] This oil sample. I would like a fatty acid profile done similar to our former firm lipotech LLC."

75.     In or around April 2010, rather than disclosing the missed Funding Deadline and the dissolution of CCO, O'HAIMHIRGIN instead told Investor TB that Ross Science was going down the path of manufacturing the oil itself. This was a different strategy than what RODAK and O'HAIMHIRGIN presented to Investor TB at the time of investment.

76.     On or about August 6, 2010, in response to Investor TB's request to cash out his shares, O'HAIMHIRGIN lulled Investor TB into a false sense of security in telling Investor TB that he may not want to sell his shares within six months of a product going to market.

77.     On or about September 8, 2010, O'HAIMHIRGIN ("LO") and Investor TB ("TB") had a phone conversation where the following was discussed:

    TB:    But my money did not go to fund Lipotech.

17

LO:   No. Your money went to fund the research that we had to put money in to
do stuff at the clinic, and the legal fees, and other stuff. So...

TB:   And half of it, which is already done, you know...

LO:   What's that?

TB:   Uh... I, well, wasn't half the research already done by that guy? Your
doctor?

LO:   Yeah, but there's more, we did more work at the clinic since you invested.

TB:   Oh.

ii.   O'HAIMHIRGIN's Use of Investor TB's Funds:

78.   On or about February 23, 2009, Investors TB and RB wire transferred funds in the
amount of $50,000 to O'HAIMHIRGIN's U.S. Bank account ending in x2570. Approximately
$46,000 of Investor TB's investment was used for purposes other than public relations,
marketing of the oil, research, and legal fees. Rather, O'HAIMHIRGIN caused Investor TB's
funds to be transferred to O'HAIMHIRGIN's personal brokerage and bank accounts.
O'HAIMHIRGIN also used Investor TB's funds to make payments on O'HAIMHIRGIN's home
mortgage and on non-Ross Science related debts.

iii.   RODAK's Use of Investor TB's Funds

79.   On or about February 23, 2009, Investors TB and RB transmitted a wire transfer
of $50,000 to RODAK's personal U.S. Bank account ending in number x0497. Investor TB's
funds to RODAK were used for purposes other than public relations, marketing of the oil,
research, and legal fees.

iv.    Investor DM

80.    O'HAIMHIRGIN, at one time, was Investor DM's financial advisor.
O'HAIMHIRGIN introduced Investor DM to the Ross Science opportunity. O'HAIMHIRGIN
represented that Investor DM's investment would be used for development and marketing.
RODAK and O'HAIMHIRGIN did not inform Investor DM of the Funding Deadline.

81.    On or about January 21, 2010, two days before the Funding Deadline,
O'HAIMHIRGIN solicited a $50,000 investment from Investor DM.  Investor DM wrote two
checks payable to RODAK and O'HAIMHIRGIN personally for $25,000 each.
O'HAIMHIRGIN told Investor DM the checks would be deposited into the Ross Science
account.

82.    Contrary to O'HAIMHIRGIN's representations, Investor DM's investment was
not deposited into the Ross Science account.  The money was used as follows:

v.    O'HAIMHIRGIN's Use of Investor DM's Investment

83.    O'HAIMHIRGIN transferred $12,000 to LFG which was subsequently
transferred to LDG and used to pay the Legend Office Building mortgage payment.
O'HAIMHIRGIN transferred approximately $5,000 to a credit line in the name of
O'HAIMHIRGIN and LFG.  O'HAIMHIRGIN transferred $8,000 to another personal bank
account held in his and his wife's names and transferred $3,088 to pay O'HAIMHIRGIN's
home mortgage.

vi.    RODAK's use of Investor DM's Investment

84.    RODAK's use of Investor DM's funds included payments for personal
expenditures and transfers to businesses controlled by RODAK not related to Ross Science.

19

vii.    Investor WF's Investment:

85.    Investor WF has known RODAK since at least the year 2000 and considered RODAK a long time personal friend.  RODAK and O'HAIMHIRGIN assisted Investor WF with managing his investment accounts.

86.    On or about January 4, 2010, before the Funding Deadline, RODAK solicited Investor WF to invest in Ross Science/CCO, which RODAK claimed was developing an oil through seaweed.  That investment was funded through an early withdrawal of Investor WF's Individual Retirement Account ("IRA"), on which he paid approximately $32,000 in taxes.

87.    In or around October 2010, nine months after CCO's registration was terminated and after losing the rights to the patents and technology, RODAK solicited another approximately $100,000 investment from Investor WF.  Investor WF provided approximately $100,000, via personal checks that were funded through IRA withdrawals.  At the time of the second investment, RODAK provided Investor WF with a CCO brochure.  RODAK stated that the money was needed for more testing as they were switching the oil from seaweed to yeast.

88.    At no time did RODAK or O'HAIMHIRGIN tell Investor WF of any funding requirement with Lipotech, nor did they say that his investment could be used for their personal expenses.  Investor WF was told his investment would be used for research.

viii.   RODAK's use of Investor WF's Investment

89.    Investor WF's funds were deposited into RODAK's personal US Bank account ending in number x0497.  The funds were then used to pay RODAK's personal legal bills, personal credit cards, and other personal expenses and transferred to other entities under RODAK's control.

K.    Transfer of Shares

90.    RODAK and O'HAIMHIRGIN lost access to the Lipotech technology and patents
when they enriched themselves by selling their own personal shares in Ross Science rather than
raising capital for Ross Science and CCO.  Having failed to meet the $6 million capital raise,
RODAK and O'HAIMHIRGIN, without notice to the investors, created a new company, Tersus,
and assigned pro rata Class B shares of Tersus to most of the Ross Science investors.  RODAK
and O'HAIMHIRGIN awarded themselves and certain individuals close to them Class A shares
in Tersus, which carried certain exclusive rights unavailable to Class B shareholders.  Rather
than disclose to the investors that Ross Science failed to meet the capital raise and return the
investors their investments per the PPM, RODAK and O'HAIMHIRGIN lulled the investors into
believing that their investments were secure and that manufacturing was in progress.

91.    Beginning in or around May 2010, RODAK, O'HAIMHIRGIN, and others at
their direction began soliciting new investors to invest in Tersus without providing notice to the
prior Ross Science investors that Tersus even existed and that they owned it.

92.    On or about June 29, 2010, RODAK and O'HAIMHIRGIN each sold a 1.875%
membership interest of their personal shares in Tersus for approximately $150,000 each.

93.    In or around September 2010, under questioning from Ross Science investors
about what had happened to CCO and the patents, O'HAIMHIRGIN finally stated that he and
RODAK chose not to fund the Lipotech deal because Lipotech purportedly did not have the
technology it claimed it had.

94.    In or around October 2010, nearly nine months after the lapse of the funding
deadline, RODAK induced Investor WF to invest another $100,000 into Ross Science and

provided Investor WF with a CCO technology brochure even though CCO was dissolved nine months earlier in or around January 2010.

### III.    STATUTORY ALLEGATIONS

#### COUNT 1
(Conspiracy to Commit Mail Fraud, 18 U.S.C. § 1341, and Wire Fraud, 18 U.S.C. § 1343, in violation of 18 U.S.C. § 1349)

95.    The allegations contained in paragraphs 1 through 19 and 30 through 94 of this Indictment are repeated and realleged as if fully set forth herein.

96.    From in or around September 2007, through in or around April 2012, the exact dates being unknown to the Grand Jury, within the Northern District of Ohio, Eastern Division, and elsewhere, Defendants PAUL RODAK and LOCHLAINN O'HAIMHIRGIN, together and with others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate, and agree with each other, and with others both known and unknown to the Grand Jury, to commit federal criminal offenses, to wit:

a.    To devise and intend to devise a scheme and artifice to defraud investors, and to obtain money by means of false and fraudulent pretenses, representations, and promises from investors, and for the purpose of executing such scheme and artifice, to place in any post office and authorized depository for mail matter, any matter and thing whatever to be sent and delivered by the Postal Service, and to deposit and cause to be deposited any matter and thing whatever to be sent and delivered by any private and commercial interstate carrier, and to take and receive therefrom, any such matter and thing, and knowingly cause to be delivered by mail and such carrier according to the direction thereon, and at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter and thing, in violation of Title 18, United States Code, Section 1341 (Mail Fraud).

b.       To devise and intend to devise a scheme and artifice to defraud investors, and to obtain money by means of false and fraudulent pretenses, representations, and promises from investors, and for the purpose of executing such scheme and artifice, to transmit and cause the transmission by means of wire communications in interstate commerce any writing, sign, signal, and picture, in violation of Title 18, United States Code, Section 1343 (Wire Fraud).

## OBJECTS OF THE CONSPIRACY

97.      The objects of the conspiracy were to:  (1) defraud the investors; (2) obtain investor monies; (3) defraud Lipotech; and (4) enrich the conspirators.

## MANNER AND MEANS OF THE CONSPIRACY

98.      To attain the objects of the conspiracy, Defendants employed the following manner and means:

a.       It was a part of the conspiracy that RODAK and O'HAIMHIRGIN gave presentations to prospective investors in which they falsely represented that the purpose of the investor funds was for expenses related to legal, marketing, medical testing, and technology.

b.       It was a part of the conspiracy that RODAK and O'HAIMHIRGIN represented to prospective investors that their returns on investment could be as high as 14,900.00%.

c.       It was a part of the conspiracy that RODAK and O'HAIMHIRGIN represented to prospective investors that they would see returns on their investments in the short term.

d.       It was a part of the conspiracy that RODAK and O'HAIMHIRGIN induced and attempted to induce investors to invest by misrepresenting how quickly they would have a product to market.

e.       It was a part of the conspiracy that RODAK and O'HAIMHIRGIN did not disclose to many of the prospective investors that CCO and its ownership of the patents and the technology was contingent on RODAK and O'HAIMHIRGIN meeting the capital raise requirement by the Funding Deadline.

f.       It was a part of the conspiracy that RODAK and O'HAIMHIRGIN attempted to conceal the existence of Lipotech from the prospective investors.

g.       It was a part of the conspiracy that RODAK and O'HAIMHIRGIN sold their personal shares in Ross Science rather than selling shares of CCO per the PPM and agreement with Lipotech.

h.       It was a part of the conspiracy that RODAK and O'HAIMHIRGIN sold their personal shares for their own personal gain rather than raising funds towards the $6 million capital raise and contributing to the capitalization of CCO.

i.       It was a part of the conspiracy that RODAK and O'HAIMHIRGIN used the CCO investment as an opportunity to enrich themselves at the expense of current and prospective investors.

j.       It was a part of the conspiracy that RODAK brokered the sale of SL's and SP's shares to receive a commission on the sale price.

k.       It was a part of the conspiracy that when Investor DK and Investor LK eventually learned of the Funding Deadline, RODAK and O'HAIMHIRGIN misrepresented to investors the status of investments and that extensions to the deadline had been granted.

l.       It was a part of the conspiracy that RODAK represented to BM that funding was secured, when RODAK then well knew, RODAK and O'HAIMHIRGIN had not met the $6 million capital raise requirement.

m.     It was a part of the conspiracy that RODAK and O'HAIMHIRGIN concealed the status of their capital raise efforts.

n.     It was a part of the conspiracy that O'HAIMHIRGIN solicited an investor to purchase shares two days before the Funding Deadline was to expire.

o.     It was a part of the conspiracy that RODAK and O'HAIMHIRGIN continued to solicit investments after the Funding Deadline had passed and CCO ceased to exist.

p.     It was a part of the conspiracy that RODAK and O'HAIMHIRGIN did not return investor funds upon failing to meet the $6 million capital raise as required by the PPM.

q.     It was part of the conspiracy that RODAK and O'HAIMHIRGIN did not hold the investor funds in escrow as required by the PPM.

r.     It was a part of the conspiracy that RODAK and O'HAIMHIRGIN did not inform many of the investors that they had failed to meet the Funding Deadline, that Ross Science lost control of all patents and technology, and that CCO ceased to exist.

s.     It was a part of the conspiracy that O'HAIMHIRGIN continued to lull at least one investor into believing the investment was safe by representing that the technology would receive GRAS ("generally regarded as safe") certification before year end 2010.

t.     It was a part of the conspiracy that O'HAIMHIRGIN told at least one investor that manufacturing was in progress when he then well knew that manufacturing was in fact not in progress.

u.     It was a part of the conspiracy that RODAK and O'HAIMHIRGIN lulled investors into believing that a product would soon be on the market.

v.     It was a part of the conspiracy that RODAK and O'HAIMHIRGIN used Tersus to placate the investors and to circumvent the requirement that the investors' investments

be returned, investments which had largely been spent on the personal expenses of RODAK and O'HAIMHIRGIN.

w.    It was a part of the conspiracy that RODAK and O'HAIMHIRGIN did not disclose the existence of Tersus to many of the Tersus shareholders until many months after the shares in Tersus were assigned.

x.    It was a part of the conspiracy that RODAK and O'HAIMHIRGIN granted the Ross Science investors Class B shares in Tersus, but granted themselves Class A shares.

y.    It was a part of the conspiracy that RODAK and O'HAIMHIRGIN continued to cite to the favorable results of MP's Cleveland Clinic study on the Lipotech oil post-funding deadline even though Ross Science had lost access to the technology and the patents and CCO had ceased to exist.

z.    It was a part of the conspiracy that O'HAIMHIRGIN told investors that Tersus had an alternative source established when it in fact did not.

<u>ACTS IN FURTHERANCE OF THE CONSPIRACY</u>

99.    In furtherance of the conspiracy and to effect its unlawful objects, Defendants committed, and caused to be committed, the following acts in furtherance of the conspiracy in the Northern District of Ohio, and elsewhere:

a.    On or about September 19, 2008, RODAK and O'HAIMHIRGIN caused funds in the amount of approximately $100,000 to be wire transferred from Investor KL's account at JP Morgan Chase (hereinafter, "JPMC"), to an account in the name of RODAK and his wife at U.S. Bank.

b.      On or about September 19, 2008, RODAK and O'HAIMHIRGIN caused funds in the amount of approximately $100,000 to be wire transferred from Investor KL's account at JPMC, to an account in the name of O'HAIMHIRGIN at U.S. Bank.

c.      On or about September 23, 2008, RODAK used investment monies to pay $65,000 to a landscaping company.

d.      On or about September 23, 2008, RODAK transferred and caused to be transferred approximately $25,000, which contained investor funds, from a U.S. Bank account ending in x0497, held in his and his wife's name, to LDG's U.S. Bank account ending in x3931.

e.      On or about September 24, 2008, RODAK transferred and caused to be transferred, approximately $24,250 in loan payments from LDG's U.S. Bank account ending in x3931 to Parkview.

f.      On or about February 23, 2009, RODAK and O'HAIMHIRGIN caused funds in the amount of approximately $50,000 to be wire transferred from Investor R.B.'s account at National City, to an account in the name of RODAK and his wife at USBank.

g.      On or about February 23, 2009, RODAK and O'HAIMHIRGIN caused funds in the amount of approximately $50,000 to be wire transferred from Investor R.B.'s account at National City, to an account in the name of O'HAIMHIRGIN at USBank.

h.      On or about September 14, 2009, RODAK and O'HAIMHIRGIN presented the technology to potential investors. A slide from the presentation indicated the purpose of the investment was for "Legal, Marketing, Medical Testing & Technology" and "Acquisition Costs necessary to Maximize Shareholder Value". Another slide indicated the 6-12 month return on investment could range from 12.50% to 14900.00%.

     i.     On or about October 2, 2009, RODAK helped broker the sale of 3.5% of SP's membership interests, approximately $1,000,000, in exchange for a commission payment of approximately $50,000.

     j.     On or about October 2, 2009, $50,000 was wire transferred from SP's account to an account in the name of RODAK and his wife at U.S. Bank.

     k.     On or about December 22, 2009, O'HAIMHIRGIN transferred and caused to be transferred, approximately $20,000, which contained investor funds, from a U.S. Bank account ending in x2570, held in his name, to LFG's account ending in x4933.

     l.     On or about December 24, 2009, RODAK and O'HAIMHIRGIN transferred and caused to be transferred, approximately $23,500 from LFG's U.S. Bank account ending in x4933, to LDG's U.S. Bank account ending in x3931.

     m.     On or about December 29, 2009, RODAK and O'HAIMHIRGIN transferred and caused to be transferred, approximately $22,412 in loan payments from LDG's account ending in x3931 to Parkview.

     n.     On or about January 29, 2010, O'HAIMHIRGIN transferred and caused to be transferred, approximately $12,000, which contained investor funds, from a U.S. Bank account ending in x2570, held in his name, to LFG's account ending in x4933.

     o.     On or about January 29, 2010, RODAK and O'HAIMHIRGIN transferred and caused to be transferred, approximately $22,500 from LFG's U.S. Bank account ending in x4933, to LDG's U.S. Bank account ending in x3931.

     p.     On or about February 1, 2010, RODAK and O'HAIMHIRGIN transferred and caused to be transferred, approximately $22,412 in loan payments from LDG's account ending in x3931 to Parkview.

q.      On or about March 19, 2010, RODAK and O'HAIMHIRGIN sold 0.125% of one share in Ross Science to Investor SO for the approximate amount of $25,000.

r.      On or about April 19, 2010, O'HAIMHIRGIN transmitted an email to Investor TB wherein he stated "[o]ur plan is to have an FDA-approved GRAS product by year end."

s.      On or about June 8, 2010, O'HAIMHIRGIN transmitted an email to Investor TB wherein he stated that "manufacturing [was] in progress."

t.      On or about August 6, 2010, O'HAIMHIRGIN told Investor TB that he may not want to redeem his shares as Ross Science drew closer to getting the product to market.

u.      On or about September 8, 2010, O'HAIMHIRGIN and Investor TB had a phone conversation where O'HAIMHIRGIN stated that Investor TB's "money went to fund the research that we had to put money in to do stuff at the clinic, and the legal fees, and other stuff."

v.      On or about September 8, 2010, O'HAIMHIRGIN and Investor TB had a phone conversation where O'HAIMHIRGIN stated that "we did more work at the clinic since you invested."

w.      On or about October 11, 2010, during an investment solicitation meeting, RODAK provided Investor WF with a CCO Technology Brochure, a company that was dissolved on or about January 25, 2010.

x.      On or about October 13, 2010, RODAK and O'HAIMHIRGIN caused a mailing to be sent from Investor WF's account ending with x9625 at Allianz, located in Minneapolis, MN to Investor WF located in Chesterland, OH.

y.      On or about October 13, 2010, RODAK and O'HAIMHIRGIN caused a mailing to be sent from Investor WF's account ending with x5694 at Allianz, located in Minneapolis, MN to Investor WF located in Chesterland, OH.

z.      On or about October 28, 2010, RODAK transferred and caused to be transferred, approximately $20,000, which contained investor funds, from a U.S. Bank account ending in x0497, held in his and his wife's name, to LDG's U.S. Bank account ending in x3931.

aa.     On or about November 1, 2010, RODAK and O'HAIMHIRGIN transferred and caused to be transferred, approximately $26,273 in loan payments from LDG's account ending in x3931 to Parkview.

bb.     On or about November 5, 2010, O'HAIMHIRGIN told Investor TB that Ross Science was operating and that the investors' investments were spent on Lipotech, the Clinic, JB, and consulting fees.

cc.     On or about November 6, 2010, O'HAIMHIRGIN told Investor TB that RODAK and O'HAIMHIRGIN awarded Investor TB an ownership interest in Tersus.

dd.     On or about November 6, 2010, O'HAIMHIRGIN told Investor TB that RODAK and O'HAIMHIRGIN have found an alternative source.

ee.     On or about November 10, 2010, RODAK told SL that RODAK and O'HAIMHIRGIN awarded her 5% ownership in Tersus.

ff.     On or about November 12, 2010, O'HAIMHIRGIN told Investor DM that he was hoping to bring a product to market within the next three to six months.

All in violation of Title 18, United States Code, Section 1349.

30

## COUNTS 2 – 4
(Mail Fraud, 18 U.S.C. § 1341)

The Grand Jury further charges:

100.    The allegations contained in paragraphs 1 through 19 and 30 through 94, and the factual allegations contained in paragraphs 97 through 99, are re-alleged and incorporated as though fully set forth herein.

101.    From in or around September 2007, through in or around April 2012, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants PAUL RODAK and LOCHLAINN OHAIMHIRGIN did devise and intend to devise a scheme and artifice to defraud investors and to obtain money and property from investors by means of false and fraudulent pretenses, representations, and promises.

102.    On or about the dates set forth below, in the Northern District of Ohio, Eastern Division, and elsewhere, for the purpose of executing the foregoing scheme, RODAK and O'HAIMHIRGIN did cause to be placed in an authorized depository the mail matter described below to be sent and delivered according to the direction thereon, with each mailing constituting a separate count of Mail Fraud:

| COUNT | DATE | DOCUMENT MAILED | FROM | TO |
|---|---|---|---|---|
| 2 | 10/13/2010 | Letter from Allianz to Investor WF with the attached $14,510.03 check | Minnesota | Northern District of Ohio |
| 3 | 10/13/2010 | Letter from Allianz to Investor WF with the attached $14,000 check | Minnesota | Northern District of Ohio |
| 4 | 04/10/2012 | Ross Science K-1 | Northern District of Ohio | South Carolina |

All in violation of Title 18, United States Code, Sections 1341 and 2.

COUNTS 5 through 7<br>(Wire Fraud, 18 U.S.C. § 1343)

The Grand Jury further charges:

103.    The allegations contained in paragraphs 1 through 19 and 30 through 94, and the factual allegations contained in paragraphs 97 through 99, are re-alleged and incorporated as though fully set forth herein.

104.    From in or around September 2007, through in or around April 2012, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant LOCHLAINN O'HAIMHIRGIN knowingly devised, and intended to devise, a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises.

105.    On or about the dates listed below, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants, for the purpose of executing and attempting to execute the foregoing scheme and artifice, transmitted and caused to be transmitted, writings, signs, signals, pictures, and sounds by means of wire and radio communication, in interstate commerce, to wit; telephone communications that Defendant caused to be sent, received, and transmitted, to and from Investor TB in South Carolina, Virginia, or West Virginia, to the Northern District of Ohio, and elsewhere, as described below:

| COUNT | DATE | DEFENDANT | SENT FROM | RECEIVED IN |
|---|---|---|---|---|
| 5 | 11/05/2010 | O'HAIMHIRGIN | South Carolina, Virginia, or West Virginia | Northern District of Ohio |
| 6 | 11/06/2010 | O'HAIMHIRGIN | South Carolina, Virginia, or West Virginia | Northern District of Ohio |

| COUNT | DATE | DEFENDANT | SENT FROM | RECEIVED IN |
|---|---|---|---|---|
| 7 | 11/06/2010 | O'HAIMHIRGIN | South Carolina, Virginia, or West Virginia | Northern District of Ohio |

All in violation of Title 18, United States Code, Sections 1343 and 2.

COUNT 8

(Securities Fraud, 15 U.S.C. §§ 78j(b) and 78ff)

The Grand Jury further charges:

106.    The allegations contained in paragraphs 1 through 19 and 30 through 94, and the factual allegations contained in paragraphs 97 through 99, are re-alleged and incorporated as though fully set forth herein.

107.    From in or around September 2007, through in or around April 2012, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants PAUL RODAK and LOCHLAINN O'HAIMHIRGIN unlawfully, willfully, and knowingly, by the use of the means and instrumentalities of interstate commerce and of the mails, directly and indirectly, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5, by

a.    employing devices, schemes, and artifices to defraud;

b.    making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

c.    engaging in acts, practices, and courses of business which operated and would operate as a fraud upon investors, in connection with the purchase and sale of the securities, to wit:  shares of Ross Science.

33

108.    From in or around September 15, 2008, through in or around October 26, 2010, Defendants received and embezzled approximately $1,800,000 in investor monies.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

<u>COUNT 9</u>
(Conspiracy to Commit Bank Fraud,
18 U.S.C. § 1344, in violation of 18 U.S.C. § 1349)

The Grand Jury further charges:

109.    The allegations contained in paragraphs 1 through 29, 36 through 42, 44, 48 through 60, 68, and the factual allegations contained in paragraphs 99d, 99e, 99l, 99m, 99o, 99p, 99z, and 99aa, are re-alleged and incorporated as though fully set forth herein.

110.    From in or around 2005, through in or around 2011, the exact dates being unknown to the Grand Jury, within the Northern District of Ohio, Eastern Division, and elsewhere, Defendants PAUL RODAK and LOCHLAINN O'HAIMHIRGIN, together with others known and unknown to the Grand Jury, did knowingly and intentionally, combine, conspire, confederate, and agree together and with each other and with others to commit a federal offense, to wit: violation of Title 18, United States Code, Section 1344(1) and (2) (bank fraud), that is, to knowingly execute and attempt to execute a scheme and artifice to defraud a financial institution, and to obtain moneys, funds, assets, and property owned by and under the custody and control of the financial institution, by means of false and fraudulent pretenses, representations, and promises.

## OBJECTS OF THE CONSPIRACY

111.    The objects of the conspiracy were to:  (1) defraud the financial institution;

(2) obtain monies owned by and under the custody and control of the financial institution; and

(3) enrich the conspirators.

## MANNER AND MEANS OF THE CONSPIRACY

112.    To attain the objects of the conspiracy, Defendants employed the following

manner and means:

a.    It was a part of the conspiracy that RODAK and O'HAIMHIRGIN

provided false statements and information to Parkview to induce Parkview into disbursing the

loan funds.

b.    It was a part of the conspiracy that RODAK and O'HAIMHIRGIN failed

to disclose material information to Parkview to induce Parkview into disbursing the loan funds.

c.    It was a part of the conspiracy that RODAK and O'HAIMHIRGIN urged

Cynergies to execute the lease agreement that misrepresented the rental amount.

d.    It was a part of the conspiracy that RODAK and O'HAIMHIRGIN

provided a lease agreement to Parkview as evidence of rental income that misrepresented the true

rental amount RODAK and O'HAIMHIRGIN expected the tenant to pay.

e.    It was a part of the conspiracy that RODAK and O'HAIMHIRGIN entered

into an addendum with Cynergies that adjusted the rental income downward without disclosing

the addendum to Parkview.

f.    It was a part of the conspiracy that RODAK and O'HAIMHIRGIN

permitted Cynergies to use previously provided lump sum payments as "prepaid rent" on the

Cynergies lease agreement, and did not disclose the "prepaid rent" to Parkview.

## ACTS IN FURTHERANCE OF THE CONSPIRACY

113.    In furtherance of the conspiracy and to effect its unlawful objects, Defendants committed, and caused to be committed, the following acts in furtherance of the conspiracy in the Northern District of Ohio, and elsewhere:

a.    In and around 2005, RODAK and O'HAIMHIRGIN obtained a $3.2 million loan from Parkview to construct an office building at 387 Golf View Lane in Highland Heights, Ohio.

b.    On or about July 13, 2006, Cynergies paid $50,000 as a sponsorship fee for a golf tournament organized by RODAK and O'HAIMHIRGIN.

c.    On or about December 29, 2006, Cynergies paid $100,000 as a sponsorship fee for a golf tournament organized by RODAK and O'HAIMHIRGIN.

d.    On or about January 16, 2007, RODAK and O'HAIMHIRGIN on behalf of Legend executed a lease agreement with Cynergies and its principals, DH and EC, for space at 387 Golf View Lane.

e.    On or about January 26, 2007, RODAK and O'HAIMHIRGIN gave the principals of Cynergies an addendum to the lease agreement that confirmed a rental prepayment and a lower monthly rent payment.

f.    On or about August 1, 2007, RODAK and O'HAIMHIRGIN obtained an additional $800,000 loan from Parkview for the further construction of the Legend Office Building at 387 Golf View Lane.

All in violation of Title 18, United States Code, Section 1349.

<u>COUNT 10</u>
(Bank Fraud, 18 U.S.C. § 1344)

The Grand Jury further charges:

114.     The allegations contained in paragraphs 1 through 29, 36 through 42, 44, 48

through 60, 68, and the factual allegations contained in paragraphs 99d, 99e, 99l, 99m, 99o, 99p,

99z, and 99aa, are re-alleged and incorporated as though fully set forth herein.

115.     From in or around 2005, through in or around 2011, in the Northern District of

Ohio, Eastern Division, and elsewhere, Defendants PAUL RODAK and LOCHLAINN

O'HAIMHIRGIN, knowingly executed and attempted to execute a scheme and artifice to

defraud Parkview Federal Savings Bank (hereinafter, "Parkview"), and to obtain moneys, funds,

assets, and property owned by and under the custody and control of Parkview, by means of

materially false and fraudulent pretenses, representations, and promises.

116.     The following acts were parts of the scheme and artifice to defraud, and to obtain

moneys, funds, assets and property owned by and under the custody and control of Parkview, by

means of materially false and fraudulent pretenses, representations, and promises:

a.        Defendants RODAK and O'HAIMHIRGIN solicited funds from a

prospective (and later, an actual) tenant at the 387 Golf View Lane property to support a golf

tournament the Defendants were organizing;

b.        Defendants induced the payments from the tenant, Cynergies Solutions

Group ("Cynergies"), by promising that the payments would result in a reduction in monthly rent

payments;

c.        Defendants had the principals of Cynergies sign a lease that falsely

reflected monthly rent payments due under the lease that were unreduced for the golf tournament

sponsorship payments;

37

d.      Defendants submitted to Parkview a lease agreement that falsely overstated the monthly rent being paid by Cynergies; and

e.      Defendants provided to the principals of Cynergies a "lease insert" that showed the lower monthly rent actually being paid by Cynergies.

All in violation of Title 18, United States Code, Sections 1344(1) and (2), and 2.

### COUNT 11
(False Statements to Bank, 18 U.S.C. § 1014)

The Grand Jury further charges that:

117.    The allegations contained in paragraphs 1 through 29, 36 through 42, 44, 48 through 60, 68, and the factual allegations contained in paragraphs 99d, 99e, 99l, 99m, 99o, 99p, 99z, and 99aa, are re-alleged and incorporated as though fully set forth herein.

118.    From in or around July 2008, through in or around July 2013, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants PAUL RODAK and LOCHLAINN O'HAIMHIRGIN knowingly made a material false statement and report for the purpose of influencing the action of Parkview Federal Savings Bank, a financial institution, in connection with an application for a loan and any change and extension of any of the same, in that Defendants did falsely represent and provide a lease agreement that stated Cynergies was paying a monthly rent of $10,581 each month, when in truth and in fact, as Defendants then well knew, Defendants entered into an addendum with Cynergies that lowered the monthly rent to $8,351 each month.

All in violation of Title 18, United States Code, Section 1014.

Original document - - Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002